Good afternoon, ladies and gentlemen. I'm here to hear oral argument in the case of the United States v. Seljan. Counsel ready? May it please the Court, Gerald Ranin, appearing on behalf of John Seljan. At issue here is whether the custom officer's reading of Seljan's personal correspondence was sufficiently invasive to violate the Fourth Amendment's reasonableness requirement. Reasonableness requires a balancing, a need to search against the invasion which the search entails. The need to search personal correspondence at the border, we contend, falls far short of the invasion of personal privacy and dignity that those searches would entail. Why? Because whatever contraband can be communicated by way of a personal correspondence and sent through the mail over the course of a day, a couple of days or a week, can easily be disseminated with the click of a mouse to a million people in a matter of minutes. Counsel, what's your view as to whether or not the search took place at the functional equivalent of the border? I concede that. I concede that, that it did take place at the functional equivalent of the border. Historically the search was not a problem. Well, if you concede that, then I'm puzzled by your reliance on a balancing test to determine the intrusiveness of a search of what is proper. In Flores-Montano, as I read it, that test was expressly rejected, and it was held that unless the search were unreasonable because of the particularly offensive manner in which it was carried out, that any border search would be reasonable. Your Honor, there is still the Fourth Amendment still applies at the border. Of course. The Supreme Court has said if it's at a border, it's reasonable, unless it's done in a peculiarly offensive manner. That's our contention, Your Honor. It was done in a peculiarly offensive manner when they opened up an envelope? What's offensive about opening an envelope? Your Honor, opening the envelope was not what was offensive here. It was the reading of the personal correspondence. They had a FedEx envelope. And the officer was, of course, authorized to look in the FedEx envelope. And it was pretty obvious at that point that there was no unlawful monetary instruments, drugs or weapons. And I would suggest that you couldn't. There's another envelope, and there could be something inside that envelope. Right. The agent was also authorized to open the envelope under 5713b. And a tactile and visual inspection of the two envelopes inside was unremarkable. They were thin. They weren't bulky. There was nothing that would have created any undue suspicion. Now, the officer was there. Anything that could have been in that envelope that would have violated the law, that would have been something that could not be sent across the border? Absolutely. Absolutely. The envelope – the officer was authorized to open this envelope and look for an unlawful monetary instrument, drugs or weapons. Was he authorized to open the paper that the letter was written on? That's where I think the line should be drawn, Your Honor. I think that the officer could have easily looked into the envelope, seen that there were no unlawful monetary instruments, no drugs and no weapons, and immediately seen that there was a personal correspondence there. So the looking is what's offensive? That's what you're saying is the peculiarly offensive search? That's correct, Your Honor. Well, generally we think of things of being offensive, you know, that the – I think that the language said if it was property, maybe if you destroyed the property. If it's a person, you tend to think of body searches, you know, body cavity searches or something along those lines. What language – you know, what cases do you have to rely on to – that something like that would be, you know, an offensive search? Well, I think historically personal correspondence has been afforded such a highly privileged position in our culture. In that regard, I would like to quote Justice Stevens, Brennan and Marshall, who descended in Ramsey. They said throughout our history, Congress has recently – But it's the dissent. Give me a majority opinion. This is – this – no one's been willing to actually decide this issue of whether reading a personal correspondence is so invasive as to just – as to follow. How do you know it's personal correspondence until you open it? Excuse me? How do you know it's personal correspondence until you open it? I think that it's pretty easy to determine if it's a personal correspondence. You could easily see writing or not. But that writing could be – could be a monetary instrument. Well, a monetary instrument, there would be – yeah. In the worst case, it could be lots of things that's folded. So until you open it and look at it and eyeball it, how do you know it's personal correspondence as contrasted with some form of monetary instrument? I suppose in that event, Your Honor, that you could shake it, quickly open it. Well, if you're shaking it, it's not going to – the piece of paper itself can be the monetary instrument. So until you open it, how do you know it isn't or is? You could open a personal correspondence, immediately see that it is a personal correspondence, and then close it up without – If – if when you immediately open it, the first word that catches your eye is 8-year-old and peanut, because it's capitalized, are you supposed to just say, oh, well, now I know it wasn't a monetary transaction, and fold it back up and let it go? Well, that's – that would be reading the personal correspondence. It's not reading it. You open it up and you see those words because they leap out at you. Are you supposed to leave your – is the customs officer supposed to leave his common sense at home? I don't think you can scan without reading. I think that the difference between scanning and reading is illusory, and that in either case, you're pulling content off the page, and if you pull content off the page, you're reading it. You have to look at the page to determine it's not a monetary instrument. Your eye is going to focus on something. Do you preclude the possibility of even focusing your eye? You've got to hold it up and make sure you can't tell what it is, except it doesn't look like a monetary instrument? Is that the rule? I think that the – it's pretty obvious when something is a personal correspondence. I don't know that – Is there any evidence here that that is what leapt out at the officer, that first word that he looked at? He knew it was – he had suspicion that it was something concerning a crime? Excuse me. I missed the first word. Was there evidence in this case that the word leapt out at the officer, that he didn't scan it, it just leapt out at him and he looked at the piece of paper? Well, he admitted scanning and reading at the same time. So he said he scanned it, and that's when he derived the meaning. It is not a situation where he said, I looked at the paper and immediately saw the incriminating words. That's right.  There's no evidence like that in this case. So he said I was – his testimony was I was scanning and reading, which I think is indistinguishable. Well, let me ask you to – excuse me. Let me ask you to assume that he had the right to scan the letter. Okay? I know you disagree with that. Let me ask you to assume he had the right to scan the letter. Once he scanned the letter, would you agree that a crime jumps off the page in plain view? If he scanned and read, I don't see a distinction between the two. Right. It's just only in the amount of content you're taking off. Of course. Let's assume for a moment. I'm sorry. Let's assume for a moment that scanning and reading is the same thing. Let's say that he just read it. He didn't scan it. He read it. How do you deal with United States v. Schor, our case? It's a 1979 case written by then-judge, now Justice Kennedy. Are you familiar with that case? I am familiar. Schor. Doesn't that nail this right on the head? Yep. Can you remind me? I'm not familiar. Yeah. This is a case, a 1979 case. It's 597 Fed Second 1303, and this has to do with the idea of plain view, and I'm just quoting what he said here. Customs officers are authorized to search where they are. They're authorized to search for material subject to duty or otherwise introduced illegally into the United States. If they discover the instrumentalities or evidence of a crime, they may seize the same. So in this particular case, you've got a customs officer going out, not coming in, but they're authorized to search. They discover it, see it. They're authorized to seize it. Well, our contention is that the officer wasn't authorized to read personal documents. I understand that's your position, but the reality is here, wasn't Mr. Selgin, he knew there was a possibility of this being searched. So he didn't have a very high level of privacy expectation, did he? I don't think he waived voluntarily. I'm not saying he didn't waive, but realistically, he admitted that he knew that it was subject to custom search. You couldn't have a very high expectation. You look at the page. There is at the very least, if you want to leave it to currency, there was a reference to a dollar sign, $500, at the bottom of the page. If the customs agent sees the reference to 500, I think it was pesos rather than dollars, which you can't tell, why couldn't the customs agent read it to see if there's some reference to currency transactions in there? And when he sees that it's not, he's authorized under the Shore case to seize it. Well, the idea about a plain view search presupposes that the agent is in a position to actually see the evidence. Our contention here is that he, the officer was never in a position to lawfully or should not have been to lawfully read the personal correspondence. And therefore, it wasn't in plain view. What case law do you have to show that? I mean, here, you've admitted there's a statute that authorizes this customs officer to open up the FedEx package, to open up the envelopes underneath it. You open it up there, you see it. What could be more in plain view than that? Aren't we engaged in a sophistry here between scanning and reading and whether he has an authority to look at it? No. I think that when you scan or read a personal correspondence, you've entered into a different realm than just searching the envelope for unlawful monetary exchange. And what case law do you rely upon for that? Well, I think we're at a point where this circuit has not decided that. I haven't found any case that's actually faced this question and made a decision about whether the reading of personal correspondence. Well, this is your contention that there's no authority to do it, but there's no authority that you can cite to that effect. Well, I think there is. I think that actually the government has consistently taken a clear statutory and regulatory stand against authorizing the reading of personal correspondence. Well, now, that's U.S. Postal, right? Excuse me? It's U.S. Postal. The U.S. regulatory? Well, you said the U.S. Is there a difference if it's a FedEx package and U.S. Postal mail? No, I don't think so. I think the fact that the personal correspondence was deposited in a letter envelope a letter. Well, let me go to that, then, because when you started and you began with your discussion of mail, but then, of course, you held up a FedEx envelope, and that's a private transaction, correct, a FedEx mailing? Yes. Okay. And the question I have, and you said this hasn't been decided, maybe it hasn't been decided directly under the scanning issue, but the Eleventh Circuit had a case, are you familiar, with the United States v. Young, where they looked at whether or not the customs could search a FedEx envelope based on the consent that one signs when you ship off your FedEx. Are you familiar with that case? No. Okay. Well, they said you could. And even in that case, the FedEx consent didn't include governmental agents. So let's leave the Eleventh Circuit aside. If you go to the record in this case, and looking at the FedEx waybill in the back of it, it says there that your shipment may, at our option or at the request of governmental authorities, be open and inspected by us or such authorities. The district court, as an alternative finding, seemed to say that there was consent. So my question is, why wouldn't we go that route, given the district court's findings, and why would it be clear error for the district court to have come to that conclusion? Your Honor, the government has the burden of to show that Selgin knowingly and voluntarily waived his Fourth Amendment rights. And the signing of the back, the signing of an airway bill, the back of which has in small print a waiver, I don't think that we can say, I don't see any evidence in the record that shows that Mr. Selgin knowingly and voluntarily signed that. The district court said he knew that it could be searched by customs. He knew it would have to go through customs, which often involves a search, correct? That's correct, Your Honor. If I was, I think that by signing that and knowing that something has to go through customs is not equivalent to. Did the district court find that he consented to have the materials read? The district court, I'm sorry? Did the district court find that he consented to have the letters read? No. They didn't. He simply consented to a search. Right. Yes. And I think that it's reasonable to assume that, I mean, a custom search, in my mind, could be a scanning search. Okay. So then you're back to the ‑‑ I mean, the difficulty is that from your position, you would say that the signing on the front and the air bill on the back has no effect, correct? Not with respect to the reading of personal correspondence. Okay. But where does it say that? I mean, see, the difficulty I have is that it seems to have some effect that you can search my envelope, but you can't read my correspondence, but I can scan it. So it seems like I can search, I can scan, I can't read, and then that's where we draw the line, even under the air bill language? You can search ‑‑ I believe that the line is you can search the FedEx envelope. You can search the letter envelope for the identified contraband. But you can't start reading people's personal correspondence, because that's laying bare their inner thoughts. Is a letter of credit a monetary instrument? Let's assume it is. That's an excellent question. I don't know the answer. Let's assume a letter of credit is a monetary instrument. And usually letters of credit come on pieces of paper and they don't come on money. They don't look like money, in other words. They don't look like Filipino money or U.S. currency. They look like pieces of paper. So if you're prohibited from sending monetary instruments, which could include, for example, a letter of credit or a bare letter, would you be permitted ‑‑ how could you determine whether it was or wasn't that thing without reading it?  Well, I asked you to assume it was. Let's assume there is a ‑‑ let's assume that there are monetary instruments that can come in the form of a piece of paper. So if there is such an instrument, how could one determine whether or not a piece of paper is such an instrument without looking at it? Well, that's a highly hypothetical question that ‑‑ Well, no, it's a practical question. You've got a piece of paper in your envelope. We know he's sending money. We also know that FedEx, Waybill says you're not supposed to send cash through FedEx either. But nonetheless, he sends a little money to his relatives or something. But if you're looking at other instruments, why can't you at least look at the piece of paper to see whether it is or isn't something? So maybe we're talking about a glance now. So now I can go ‑‑ so I'm just trying to narrow it somewhere between a glance and a scan, or I'm up to scan. Now I can glance, but I can't read. Well, yeah, a glance. Like in this particular case, the letter, which is at page 4 of the government's excerpts, if you glanced at that, the only thing you would see is the cartoon. I've tried this myself a number of times. Well, maybe if you went to first grade in a certain era, you would have learned the whole page reading method. I mean, and you look at the page and you see it. Is that a glance? Can I refine this a little bit? At Exhibit 37, which is found in the later, one of these later letters, as I look at it, it appears that it had two what are styled here as adult pornography. I don't know if there were photos. I'm talking about the second. Yeah, I'm talking about the second. So let's assume that there was no first. What is before us today in your example with the FedEx package is that what he pulled out, what the agent pulls out, is Exhibit 37, which has two photographs and then the text. Does it have an ER number? It's 37. Base tab? No. He said page 4. That's the first. Yeah. It's in the same sequence as I understand the other. And the question is, would that give them probable cause to go in to read letters? Not probable cause. I'm trying to stick. I assume if you look at a letter of credit, it looks like a letter of credit. If you see a letter, such as the cartoon on it, that's clearly on its face, not a letter of credit. But the danger you have is you may have to do a lot of reading, full page or otherwise, to pick out the peanut and the rose quote. So I want to go to one of the examples where on its face, if you're looking at a piece of paper to see whether it's a letter of credit or a financial instrument, you look at it. It's clearly not that, but it's clearly pornography. Now you've got it. You've looked at it. Does that then, is it the pictures that allow him to then go on and read the content? How would you start drawing the line here? I think that a personal correspondence is easily distinguishable, would be, from a letter of credit. I understand that. What I'm trying to say is, find out is, would your position concede or not concede that the example of what he wrote and attached a couple of pictures on it, as opposed to cartoons, that if the customs agent, that that's what he encountered, would have then been allowed to read into the letter? He would have had reasonable suspicion. He would have been able to get into the contents. Or are you saying that, no, if you have to read the text, even if it's got two adult porno pictures attached to it, and even if you can just glance at it and see that there are some texts there that might suggest child pornography, you're saying he can't read the text? I'm not sure I understand the question. You're saying that if he takes written personal correspondence. I'm saying this is the letter he pulled out. Right. Would we be here today if this is the letter he pulled out and they convicted him on, instead of the one that you're fighting over? And you're saying that he saw the adult pornography. Is that right? Well, that's what's on the document. This is what he pulled out. No, I don't think he should be able to read. He can't read it, even if it's got a couple of adult porno pictures attached to it. Well, if they're adult pornography, I don't know that that's it. There's nothing illegal about that. Yeah. Nothing illegal about that. That leads me to the second question. We've all been focused on the first search. There were the subsequent searches. Is your position that none of the searches were lawful or that they're unlawful because they're tainted by the first search? Well, the initial search, of course, tainted everything else. But I would like to address the second search. The second search came off pretty much like the first search. The agent read, went into the envelopes, opened up the personal correspondence and read them. And then, actually, he read the first one, took it to Agent LeBlanc. That's not what the testimony was. I thought he said he had something caught his eye. He caught his eye? That was, I thought, his testimony. That's what the record says. Well, he said he scanned it, which, in my view, is reading. You're taking content off the page you're reading. He then took the letter to LeBlanc, and LeBlanc said, oh, yeah, I recognize this guy. This guy. And, of course, at that point, it was the same sort of invasion. You have about six minutes left. Would you like to reserve a five-word? I would. Unless there are questions for me and my colleagues. Why don't you sit down, then, and save your time. May it please the Court. I'm Michael Rafel on behalf of the United States. With me at counsel's table is AUSA Richard Lee, the trial lawyer in this case. Your Honors, the initial border search in this case was constitutional. It was authorized by statute. And in any event, it was authorized by consent. As a constitutional matter, as Judge Bea mentioned, the Supreme Court has repeatedly held that searches are reasonable at the border just by virtue of the fact that they're at the border. So the government's position in this case is that if any of us sends correspondence by FedEx out of this country anywhere that the government decides to target, that you can read anything I say. Yes. As a constitutional matter, that is correct. If I send it by letter, not by FedEx, but in a U.S. registered stamp and everything, the same rule would apply? That's a statutory and regulatory difference, not a constitutional one. And in many cases, no, that could not be opened. The standards for reasonable cause to believe if there's merchandise or contraband in a U.S. Postal Service letter that's, quote, unquote, sealed for inspection, which is only first-class mail or certain classes of mail that are defined by the post office, that standard is actually fairly low if you look at the appendix to the CFR, Section 45 of the CFR. So Fourth Amendment's the constitutional floor. Yes. And then you have statutory. The Congress can give more protection. Absolutely. All right. And in the case of FedEx, is there more protection than the constitutional floor? There is not. So your position is that any e-mail that goes out of the country could be read by the government? Yes or no? Your Honor, that's a ---- Yes or no? No, because it's a more complicated situation, as I understand it, with e-mails as to exactly where they're going. They cross the border. Electrons cross the border just like everything else. How about if you send your laptop for repair to Taiwan? Yes, they can be ---- I'm sorry. They can open it up, copy the hard drive, read everything on the hard drive? They can read. Whether you can copy the hard drive might be a separate question. But yes, it can be read, just like documents that are on a traveler's person when they go across the border. The difference is ---- So if you have in your suitcase, if you have your personal diary with a little mark on it, the customs agent can read your personal diary? Absolutely. And the only ---- under Flores-Montano, as Justice ---- Absolutely. That's the government's position. Yes, it is. Under Flores-Montano, the limit ---- Flores-Montano doesn't help you at all. What Flores-Montano says is if they are looking for something that is illegal and that can be concealed there, which was the gas tank, they can look. They don't need suspicion. Yes. It doesn't say they can't look for things that are not themselves illegal. And last I heard, writing in your diary is still legal. Well, it can be evidence of a crime. A very common ---- Is there anything that suggests that the government has authority to, without suspicion, to look for evidence of crime? Yes. At the border? Not for smuggling, not for actually bringing something across the border, but evidence of another crime. Yes. Maybe you've committed some sort of ---- involved in some sort of conspiracy that you have written in your correspondence. What authority do you have for that? Customs has authority to search ---- Where do you have the case authority? Section 19. Where do you have the case authority that's constitutional, that the government has authority to, when you're crossing the border, to look for evidence of crime not connected with the border crossing, but just that you might be a criminal in some other way? The Abbucci case from this Court, the same panel that decided this case, held an opening of FedEx. We can overrule that. Any other authority? Any Supreme Court authority? I believe that Flores-Montano and Ramsey by the Supreme Court together certainly support that proposition, that what Ramsey held is that mail is just like any other way of crossing the border. It's subject to the border search. The means that the thing goes across the border in the Supreme Court's view in Ramsey do not matter. So if a document may be searched when it's on someone's person or in an envelope when the person is crossing the border under Ramsey, the same standard applies to the search. Well, how do you know whether you can search if they have it on them when they're crossing the border? You say if, but that's the question we're examining. What is it that says that they can read every scrap of paper, everything on your laptop, everything in your PDA, everything, everything in your diary, because you happen to cross the border? This Court said in advance that the No, no. We're outside this Court. We can overrule anything this Court has done. A large amount of decisions from this Court, it's in the Lefebvre treatise at section 10.5a that papers on someone's personal search of the border and there's a lot of them. Kennedy, what does it appear? I think it's strong enough here. There's a case called Cacelli from the Eastern District of Michigan where a defendant was bringing a journal in his possession across the border from Philippines. It was a journal that detailed his sex acts in the Philippines with kids. That led to his prosecution similarly to the defendant in this case. In that case, there were other challenges, but it wasn't even challenged that the defendant could bring the journal across the border. So it's not a holding. This is something where somebody didn't challenge. But I think if you ask practitioners and judges who interpret the law, and I realize they're not sitting where this Court is sitting, but it's so well established in the law based on all sorts of holdings that one of the customs can look through papers. You know, I may be ignorant of this, and maybe I'm really the most ignorant person in this courtroom, but this is so contrary to everything I had assumed as law that I'm really surprised to have you say that. And I would expect that if it's as well established, you'd come up with a Supreme Court case saying when you cross the border, if you have your diary in your pocket, the customs agent can say, I'm going to read what you did on your vacation. You have your handwritten diary there. Would you sit down and we'll sit here and read your diary and find out what you did on your vacation. Is a Supreme Court case like that? 1882, the Supreme Court in Von Kotzhazen v. Nazareth said the effects of a person entering the U.S., whether in trunks, parcels, or envelopes, are subject to examination. And I think that's any and all. Well, I understand examination because you can bring contraband in, and there's I'm not talking about reading. Reading the contents of writings. Okay? Do you? I mean, you say it's so well established. What do you have? Do you have another circuit's opinion on the point? I think the Supreme Court has held that one can look at the contents of discs or movies in a couple cases from the 1970s. How about once it's determined that the diary is not illegal? Can they keep reading it, or at that point do they have to stop? As a constitutional matter, I do not think they have to stop. As a practical matter, that's what Customs does in the two-step process that was detailed earlier. Unless it's interesting. Well, I don't think so. I mean, what if they start enjoying it and say, you know, this is a good story. I understand the point of your question, but I think it's important that Customs does not do that, even though it might be possible. How do we know they don't do that? I mean, what, you know, the Customs agent makes a judgment, and if he's authorized to read the decision to that, you know, the point Judge Silverman has asked about is reached as really sort of a personal decision. If he says, gee, this is sort of interesting, and who knows, if I keep reading, I might find something, you know, that if it's a crime, I mean, how does he know that? In a lot of circumstances, there is a theoretical danger that government officials will not behave properly with the authority that's given to them. But, you know, in this case, the testimony is each of the ---- But your position is they don't have to stop. The answer to Judge Silverman's question is they read it, they realize it's a 16-year-old girl's diary of her trip to France and, you know, Italy, and, you know, she's writing all about visiting the Vatican and all that, and they say, you know, they're convinced that's what it is, they constitutionally can keep reading to them. Yes. The limit on that, perhaps, Your Honor, under this Court's cases such as Watson, Soto, Camacho, and Lulacan, all of which are cited in the briefs, are they're sort of about the secondary motives of a search. The first case, Watson, is the Coast Guard case where the Coast Guard can properly do administrative searches, and this Court evaluated whether the fact they have an ulterior motive to search for marijuana, whether that invalidates the whole administrative search. This Court said no in that case. Where this sort of extra reading comes in constitutionally, I think, is if customs were, for example, you know, keeping a database in some way. No, they just want to read it. Your position, on behalf of the United States, is they can read to the very end of the diary, even past the point where they think that, you know, there's really not much of a chance anything illegal here. There's nothing requiring them to stop. There is nothing. For those of us who might not be willing to buy, to swallow that big a pill, is it a small pill that the government has? Well, where I fit or I think that fits into the analysis, Judge Kaczynski, is that that would present a different question to this Court as to whether under those administrative searches, search cases, the secondary motive or practices of customs agents in reading is whether that is enough to strike down the whole search. Shouldn't the rule be that they have the right to look at any document and ascertain whether it complies with customs or is somehow otherwise evidence of a crime or illegal? Yes, Your Honor. Once they determine that it's not, they have to close it up and put it back. I mean, shouldn't that be the rule? That's fair, and that's what they do. Just to clarify your answer, when you answer the question illegal, are you saying illegal in the sense that my very by customs or illegal in the sense that there might be some crime hidden there that has nothing to do with customs? There might be some crime hidden there because, for example, in this case, the document itself is really the count that would be charged of violating section 2422b of using an interstate or foreign facility to entice a minor to have sex. That is kind of the evidence of the crime, and customs could, using its border search authority under 1581a, 19 U.S.C. 1581a, decide that it wants to specifically target this type of crime. What if instead the letter said, you know, you got $500 to your cousin, said, well, this is probably the last money I'm going to send you, because although I've got this tax fraud scheme going, it's not going well, so you won't be getting any more money from me, and there's no customs violation, no international currency violation. Could you read that letter and say, oops, we better turn that over to the U.S. attorney? I think it's evidence of, you know, evidence that goes to a crime. So in other words, evidence of any crime, you're saying, not just a customs-related crime. Yes. For example, 18 U.S.C. 2339a, material aid to terrorists, if customs had, say, information, not as to a specific envelope, but information that people might be sending particular terrorist groups in the Philippines, information that's going to be sent to the U.S. This is like a cousin in the Philippines. There's no terrorist. There's no national security threat. It's just a kind of a family confession, basically. It's got to be evidence of a crime. Realistically, I don't know. If he says he's running a tax scam, as long as it's evidence of any crime in the U.S., then you can keep reading? Yes. And I think the law What if it's this state tax fraud scheme I'm running, where I'm defrauding the state of California of taxes, but it's not going well? Just like Judge McEwen said, but it's not going well, so I'm not going to be able to send you more money. Can you do that? It's an interesting question, and I Well, thank you. I don't know. Let's see if you can get an interesting answer. The answer, you know, I frankly don't know. I haven't thought about that. The answer is certainly that they can investigate any Federal crime, Federal violations of the law. That's what the customs agents testified that they were investigating here. What would be the constitutional constraint, you know, if they can do that, what would stop them from reading when they see that it's a state crime? I mean, what is there some statutory constraint in the new scheme? Is there some constitutional constraint? There probably is not. And in every sort of realistic So your question to my to your answer to my interesting question is an interesting yes, they can keep reading. Well, why shouldn't they? I mean, if they stumble on in a letter that says I'm going to kill my wife on Monday, why should they just put the letter back in the envelope and let it go and not notify the police? That's correct. I didn't I had not thought about the question before. I don't want to jump into an answer that might not be correct, but it seems to me that there isn't a reason why they have to stop at Federal crimes rather than state crimes. Let me understand that what you're proposing is under Flores-Montano, the Fourth Amendment is the floor, and that border searches are reasonable per se. Is that correct? Yes. But there's some language that if it was, you know, if it went too far, what, you decide if it goes too far. Obviously, the appellant said it goes too far when you read people's personal things. What language do we use that's guiding us there? And then I think also the panel, the three-judge panel opinion got into a balancing test, as it were, and there's some Supreme Court language that discourages balancing. So you're proposing some black-and-white rule that it's at the border, it's reasonable per se, unless it's destroying your property or invading your personal, you know, your body space as far as that goes. They can look. If they find anything that's a crime, that's okay, and that's basically it, right? The rule, as I read Flores-Montano, is that for property, any nondestructive search is constitutional. And there's five different panel opinions that I've found at this Court that I believe have read. Kennedy, you cited Montano's, Flores-Montano's, several times, and you've adopted the suggestion of Judge Callahan that it might apply. Can you answer me this? I'm puzzled. It's not cited in your brief. It should have been cited in our brief, Your Honor. Now, one reason why it might not have been. Does that mean that at one point you might have thought, as Judge Kaczynski thought, that it wasn't really helping you? No, Judge Bea, I think probably since this whole case was really focused a lot on the question of the functional equivalent of the border when it was litigated in district court, and the Abucci case hadn't been decided yet when this case was briefed, so much of the original answering brief and the opening brief focused on the functional equivalent of the border question, so the reasonableness of the search, while properly raised by the appellant, was at that point more of an afterthought, I think, and that's what might explain it. But I do think that in addition to the destructiveness, there is some other language indicating, in Flores-Montano, Judge Kallian, indicating that there might be other types of execution of the search that might be impermissible. For example, if someone's property was kept for far too long, perhaps if a search was done in some particularly humiliating way, there might be other ways for the execution of the search. When did they copy the letter? I think that's permissible here. The district court found that that was permissible, and that isn't challenged by the defendant on appeal here. Kennedy. Your opponent has said that the language of Flores-Montano that he thinks is applicable here is a footnote which says that a border search might be deemed unreasonable because of the peculiar offensive manner in which it is carried out. That's from Ramsey. Yes. Do you think that the subject matter, the personal correspondence subject matter, evasion of that by the search, is peculiarly offensive? No, I don't think so. What would be peculiarly offensive if that isn't? For property. Now, for a search of a person, it might be different. And I think, you know, as this Court has held in Chaudhry that Flores-Montano describes it. Well, Flores-Montano is only about property, and they cited that language as being a restriction on property searches. So give me your idea of what could possibly be more peculiarly offensive than reading private correspondence. The destruction of property or the keeping it for too long, the idea that the manner of the reading of material is what could be too offensive is, I think, contrary to all sorts of Fourth Amendment law in other contexts. For example, when you're – when one is executing a search warrant, there isn't the sort of limit that agents, if they are allowed in a desk or in a locker, they can read documents that are in that desk or in that locker. There's case law from various different contexts. It depends a great deal on what they're looking for, what the search warrant authorizes. If the search warrant authorizes looking for gold bars, ingots of gold, I don't think you will find that there's any law that says you can then go ahead and you can open up the cabinet drawer to see if there are gold ingots in there, but there's nothing that says you can read the – you can read the files that are in the file cabinet. Well, Your Honor, the law is that the government could go anywhere where the thing that they're searching for might be, and I don't think there's any holding that says that they can't. There's a lot of difficult closed cases having to do with searching doctor's offices and whether or not you can look into patient files, and there's sort of an uncomfortable situation when you're really looking for things like Medicare fraud because they actually have to read patient files to see whether there's a Medicare fraud involved. But I think we've been pretty careful about saying you can't just – once you go to a What this Court held in Cortez-Rocha, which is the spare tire slashing case, the border search, it's post Flores-Fontano, is that the border search replaces the analysis that the border search replaces the warrant in the analysis. In that case, actually, it was replaces the automobile exception. So instead of probable cause to search the automobile, you have a border search. So my view is that that is the appropriate analysis, that officer – customs agents can – it's as if they have a warrant to look in the envelope. Because one could have a warrant to look for material such as this that indicates that the person is violating Section 2422 of the Criminal Code or 22 U.S.C. 2278, which is sending defense secrets abroad, if there's information that customs is acting on and looking for that sort of thing. So under your analysis, it's really irrelevant that they were looking for monetary transactions to the Philippines, and that's what they were targeting. Under your analysis, everything is open season because you could have correspondence about a trip intended to do sex tourism, you could have terrorism. Basically, there would be no limit under your view. Is that right? Yes, Your Honor. And, Judge McKeown, the agents testified that they were looking for anything in violation of law. They weren't looking for only currency. And where I agree fully with the analysis in the panel's opinion here, but I think the panel made it a step too hard, the analysis harder than it had to be, actually, because it limited its analysis to 5317B, the currency search, whereas this Court held in 1994 en banc unanimously in the Tagusada case that mail searches at the border are governed by Section 1581 and 1582, the general border search authority. Here, 1581A authorized the search, and so looked at sort of objectively, customs agents could, I think, be looking for any type of crime in their notches. Any type of crime committed anywhere? Evidence of any type of? She's wanting to say, look, you can look for anything that can be interdicted crossing a border. Yes. Money coming in, obviously, is quite a bit more, but money, drugs, guns, other kinds of things they can look for. She's wanting to say you can look for those things. It's quite a different thing saying that anything that crosses the border, there might be evidence of some crime somewhere else is subject to examination at will, without suspicion, by border agents. They're vastly different propositions. And I hear you saying the latter, that they can look, so long as a thing or person crosses a border, it can be examined minutely for anything that's an evidence of any kind of crime anywhere in the world. Yes. Over which the United States has jurisdiction. Yes, Your Honor. I'm not really sure if you break it down what the difference is, because a reason to see the difference. The difference is taking a wad of cash over $10,000 or a monetary instrument over $10,000 across the border is itself a crime. Whereas there's lots of things, taking a letter across the border that says, oh, I am committing tax fraud, or I am planning to kill my wife, you know, whatever, might be evidence of some crime somewhere else. But it is not illegal to take that piece of paper across the border. And it's one thing to say agents are looking for things that are illegal at the border, illegal to take across. It's another thing to say they have a – they have carte blanche to look for anything of this evidence of any crime anywhere. Do you understand that the two – that one is a much broader proposition than the other one? Yes, but I think that they're similar. I think Customs can look through both of them. On 19 U.S.C. 1305 – You recognize that one is much broader than the other, and you adopt the broad one. Yes, Your Honor. The statute, Section 1305, allows Customs to search, and in fact, they must search for things such as obscene materials and materials that are threats to persons. Must they search for evidence of tax fraud, State tax fraud, for example? I think, Your Honor – Or plots to commit murder? Or plans to jaywalk? Yes. I mean, certainly – certainly if they do see them, they can't ignore them. No. You're giving me a question. Yes. I – my answer is yes. Well, why do you give me answers that don't – must they look for evidence of crimes not connected with border crossing? Yes, to do their job, they must. They must do that. Yes. And there's a – What is it that says they must do that? I think it's the authority that – that it's – 1581a authorizes, which is the authority to search items of border. Would you read 1581a to me, then tell me what exactly it says that they have to do that? It gives Customs – I have it here. Why don't you pull your card and let's read together. Mr. Raphael, I wonder if I could just ask you to change the prism just a little bit here. There's been – most of the government's presentation is focused around the fact that this is occurring at the border. Your opposite counsel has conceded the fact that the government agents had the right to open the FedEx envelope, the right to open the envelope itself, and the crux of the problem seems to be what constitutional authority is there to read the letter. Would you call it scanning or reading? There's been very little discussion about plain view in this situation. And I wonder what the government's position is with respect to the fact that there was an authorization to open this up. Yes. There's only one page here. Judge Kaczynski had made reference to a diary. That's lots and lots of pages. Does the fact that this was one page make any difference in the analysis here? Yes, it does. If you reject my argument that the customs agents cannot read everything in the envelope, then I would say nevertheless, because this is one page and this is in plain view, following the panel's general analysis here in the vacated opinion, that the plain view exception applies. I would say – I'm sorry. I understand your answer, but why wouldn't that apply to every single page of a diary? One page is in plain view, and then when you flip that page, the next page is in plain view, and the next page is also in plain view, and the next page – I don't understand. Just answering Judge Smith's question, what – how are those to be different? He asked you, is it not different because it's a single page, and your answer is? In my view, it's not different. Gomez Osorio – So one page and a hundred-page diary are the same thing? They're the same thing. In my opinion, in my position, it's yes, they're the same thing. You understand, we're not asking for your personal view. We're asking for the position of the United States. So in the view of the United States, the one-page letter and the hundred-page handwritten diary are the same. Yes. The same, Your Honor. And that's your answer to Judge Smith? Yes. There's a case going on. Answer my question. That's not your answer. But if you reject my position, there might be a difference, because it's clearly in plain view when it's one page. Well, explain to me how that – how that would be, since after you look at the one page, if you find nothing there, you then turn it, and then you have the next page in plain view. Why – how is it different? Well, I do – I mean, what is it that would keep the agent from taking the page when he looks at the first page, sees nothing in plain view, that would keep him from turning the page and then have the next page in plain view? What does it mean? One way there is in a case, Gomez-Osorio, the money – a case called Gomez-Osorio from this Court, Your Honor, there are money orders taped to different pages of the magazine, and so the customs agent had to turn pages in order to find them. So in that sense, each page is in plain view. If you've rejected my position that the customs agent isn't allowed to read everything, there may be some point where the agent decides – must realize that the diary is just a diary and is not covered for a crime. Perhaps there's not, and the agent would have to read the entire diary every page, even – even if you reject my initial view. But my initial view and the view of the government is that there is not a constitutional limit on what agents can read in an envelope. It's the same as when it's on some other – It provides a – and I'm looking at 1581. It provides that customs officers may, at any place in the United States, search the vehicle or vessel and every part thereof and any person, trunk, package or cargo on board. And this is broad authority that actually the Constitution limits. This Court in Stanley provides the same. Can you read this as saying search for anything at all? This is not a search that's limited for looking for materials that are interdicted in crossing borders. This means search anything whatsoever. Yes. And I – Any – and as minute a detail as the officer chooses to – to search it, whether or not it is for purposes of finding a interdicted substance. Yes.  And if somebody goes across the border, some – well, we have this big scandal in Detroit where the emails got out. So let's suppose that those racy kind of matters were in letters and the mayor of Detroit decided to go over across the border into Canada. The agent at the border could have intercepted all his love letters. And because he was looking for evidence of maybe some kind of crime, could have read every page of those. And even though the – it was quite apparent reading through them that there was nothing other – more than an illicit affair. Your Honor, may I answer and conclude in 30 seconds? Yes. If – if the mayor goes across the border with the documents, they may be read. It's his choice to take them across the border, and that's what distinguishes the border situation from the home, even from the car, where there's a lesser standard. The location of the border – If the mayor goes across the border, the custom agent is going to read your personal correspondence. It's well known. So because of that, there's a much lower expectation of privacy. There are sound policy reasons for that. Well known based on a highly publicized decision in what? In 219 years of border search law. What I'd remind this Court is that – When was the last time your personal correspondence was read when you crossed the border? For me personally, I've gone through border searches myself and have had – And they read your personal correspondence? I don't believe so, no. But I believe I've prosecuted cases where the agents have read the letters on people, such as a case, published case called Grayson, where they read a letter from this court, read a letter from a defendant's shirt pocket, and found out that he had put – it was a note passed on the plane, discovered that he had placed drugs somewhere on the plane, and found the drugs that way. Well known to prosecutors, but I venture to say a lot of people in the United States wouldn't think so. I guess that fact isn't before the Court. What I'd – to conclude, I'd – You may as well talk about it anyway. Thank you. Thank you, Your Honor. You have about six minutes left. You don't have to take it all. I would like to quote a Supreme Court case that I think is apropos of the previous discussion. The Supreme Court has repeatedly emphasized the importance of keeping criminal investigatory motives from coloring administrative searches. That was cited by the circuit in U.S. v. 124,570, citing Camara v. Municipal Court. In Camara, the Supreme Court approved administrative searches as reasonable because, quote, the inspections are neither personal in nature nor aimed at the evidence of crime. So does the Court say that the authorities that are doing an administrative search have to disregard evidence of criminal activity they happen to encounter in the process? If it means reading – if it comes to reading personal correspondence or a diary, then yes. And I think that the content of personal correspondence only comes in the plain view if you read it. And I think that's why there's the line right there. So it's not possible to look at anything without reading it? You're saying that is a matter of fact or law? I think it's a matter of fact that if you can look at something and not read it, but if you scan it, you're reading it. I can look at a page and not pick anything off that page, but as soon as I pick one word off that page, I've read it or scanned it. As soon as I get the content, I think that allowing border agents to – Well, it's, of course, possible for – to look at a page and have your eye fall on a particular word or words, and, you know, let's say the word is treason or something, or, you know, something, something, but it's hard to come up with a single word. I mean, you might see a single word, but it's hard to come up with a single word out of context that itself is a criminal or evidence of crime. And certainly the – It's connected to other words and sentences and so on. Well, yes, that's true. And certainly the longer you look at a page, the more you're going to – your eyes are going to fall on something. But as soon as an agent would see personal correspondence or a document, then there's no need to – to linger. So when you see the word treason because it's not currency or a monetary instrument, you're supposed to stop looking and not see what the next word might be. That's your understanding? That's too long? That's correct, yes. Especially then – if not, then, of course, the border search is completely opened up to the source. The word treason does not give you reasonable suspicion to go further. Could you repeat that, please? Yes. The word treason does not give you reasonable suspicion to go – enough to go further. Well, then you've read it. No. I'm saying Judge Clifton just asked you about the word treason. Must you stop? And I understood you to say yes. Well, let me – let me amend that. And my question then, if your answer is yes, is then you must be saying that the word treason does not amount to reasonable suspicion, which would enable you to go further. Not necessarily, because – Okay. So if it – so what's – so what is the – what – Well, the word treason, without a context – It's probably a quote from Barry Goldwater. It's probably a quote from Barry Goldwater on their call of treason. It depends on the context. Everybody remembers the 64 campaign. Somebody could be talking about treason in any number of ways and not be violating any laws or – or suggesting a conspiracy. I don't think that answers the question. It says it doesn't have to be conclusive. Does it – does it say that it's not reasonably suspicious, that there's not grounds to read the next word? I wouldn't say it was grounds to read – to read the document, no. Because you shouldn't have any suspicion when you see something that says the word treason or something that says blow up World Trade Center. You shouldn't be concerned about the possibility of that being currency. So you ought to close up the letter and stuff it back in the envelope. That's your position? And you say the Constitution requires that? Well, I – I think that you could take a lot of words individually out of context. But they may not be out of context. They may be very much in context. That may be a letter talking about running a plane into the World Trade Center. But you're telling us that if it's not currency and it's not a monetary instrument, they've got to close it up and put it back in the envelope. That's your position? That's correct. And not weapons and not drugs either. That's right. Otherwise, if you let a – if you allow the reading of one word, then you've allowed the reading of everything. I don't see that you could stop that. You'd have to – you would have to open the floodgates and allow the – a general crime investigation. But why would you – why would you stop drugs but not other crimes that might be evidenced in writing? What would be your legal basis for making that distinction? Between drugs and other crimes? Yeah. Well, Camara, the Supreme Court, is basic – basically stating that they don't want these – these investigatory motives to cull their administrative searches. So here we have an administrative search. If you offered any proof whatsoever that this inspection was a subterfuge, they're actually looking for something different. And there's been no evidence submitted of that. There's been no argument that I've heard of to that effect, that this currency interdiction program was motivated by something else. And we're not talking here about purported searches of – of housing conditions or building codes in order to find drugs. There's been no suggestion here that the customs officer were doing anything other than what the customs officers were supposed to do, in the course of which he may have seen something different that was still illegal. Well, the protocol that he was given was unlawful, was unreasonable. I think that reading personal correspondence is akin to a strip search. I mean, the kind of information that is included in a diary, somebody's personal correspondence, somebody's medical information, somebody's religious beliefs, these things are so personal that I think that this qualifies. Reading personal correspondence and other documents would qualify on the level of a strip search in the context of reasonableness or unreasonableness here. With that, I'll submit. If there are any other questions. Thank you. Case. It's A.C. Foggy. We'll stand submitted. Adjourned. Bye.
judges: Kozinski, Rymer, Silverman, McKeown, Fisher